Submitted on record and briefs December 12, 1997; resubmitted En Banc April 8, affirmed May 20, petition for review allowed, Court of Appeals' decision vacated and case remanded to Court of Appeals with instructions to dismiss the case as moot July 7, 1998
See 327 Or 317, 966 P2d 220 (1998)

## COREY DEAN WEIDNER,
### *Appellant,*

*v.*

## Nicholas ARMENAKIS,
### Superintendent,
### Oregon State Correctional Institution,
### *Respondent.*

## (96C-11323; CA A96482)

959 P2d 623

Alan A. Gallagher filed the brief for appellant.

Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, and Christine Chute, Assistant Attorney General, filed the brief for respondent.

DEITS, C. J.

Warren, J., dissenting.

## DEITS, C. J.

Plaintiff seeks review of the dismissal of his petition for a writ of habeas corpus, asserting that his continued incarceration at the Oregon State Correctional Institution is in violation of the law. Plaintiff was convicted of first-degree robbery in 1989, but execution of his sentence was suspended and he was placed on probation. Plaintiff's probation later was revoked and his previous indeterminate sentence of a period not to exceed 20 years was executed. On March 14, 1996, the Board of Parole and Post-Prison Supervision (Board) deferred plaintiff's release date for a period of two years, pursuant to the provisions of ORS 144.125. In the present action, plaintiff challenges the Board's decision to defer his release, asserting that the Board erred in applying a version of the statute that was not in effect at the time that his crime was committed, in violation of *ex post facto* provisions of the state and federal constitutions. He also argues that, even assuming the Board applied the correct version of the statute, it erred in deferring his release under that version because it did not have before it a psychiatric or psychological diagnosis concluding that he suffered from a "severe emotional disturbance." We affirm.

The critical statutory provision is ORS 144.125(3). The 1993 version of that statute allows the Board to defer release if it finds that the prisoner has a "mental or emotional disturbance, deficiency, condition or disorder predisposing the prisoner to the commission of a crime to a degree rendering the prisoner a danger to the health or safety of the community." The prior version of the statute provided:

> "If a psychiatric or psychological diagnosis of present severe emotional disturbance such as to constitute a danger to the health or safety of the community has been made with respect to the prisoner, the board may order the postponement of the scheduled parole release until a specified future date." ORS 144.125(3) (1991).

In its order deferring plaintiff's release, the Board applied both the 1993 and 1991 version of the statute. The order provides, in pertinent part:

"THE BOARD HAS RECEIVED A PSYCHOLOGICAL EVALUATION ON INMATE DATED 01/09/1996.

"THE BOARD, BASED ON ALL THE INFORMATION IT IS CONSIDERING AT THIS HEARING FINDS THAT YOU DO HAVE A MENTAL OR EMOTIONAL DISTUR-BANCE, DEFICIENCY CONDITION, OR DISORDER, PREDISPOSING YOU TO THE COMMISSION OF A CRIME TO A DEGREE RENDERING YOU A DANGER TO THE HEALTH OR SAFETY OF THE COMMUNITY. THE BOARD MAKES THE ADDITIONAL FINDING THAT THE DOCTOR'S DIAGNOSIS COUPLED WITH ALL THE INFORMATION IT IS CONSIDERING, DOES RESULT IN A FINDING OF A SEVERE EMOTIONAL DISTURBANCE THAT CONSTITUTES A DANGER TO THE HEALTH OR SAFETY OF THE COMMUNITY. THE BOARD HAS CONSIDERED THIS MATTER UNDER THE PROVISION OF ORS 144.125 AS AMENDED IN 1993 AND THE LAWS IN EFFECT AT THE TIME OF THE COMMITMENT OFFENSE. THE BOARD DOES FIND THE RESULTS TO BE THE SAME UNDER EITHER VERSION."

In reaching its decision, the Board considered a psychological evaluation of plaintiff conducted by Dr. Robert Davis. That evaluation recited plaintiff's criminal history, his history of disciplinary infractions in the penitentiary, and his history of drug abuse, as well as his performance of a battery of psychological tests. Plaintiff's personality profile was characterized as "quite overtly aggressive," with "intermittent loss of control of hostile or aggressive feelings," and with the potential for " 'blow[ing] up' unpredictably on slight provocation." Davis concluded that plaintiff minimized his crimes and disciplinary infractions and that he "does not accept responsibility for his criminal behavior." In his conclusion, Davis stated:

"[Plaintiff] presents a significant emotional disturbance which is seen in ideation confusion and over-reactivity representing a Mixed Personality Disorder with Histrionic and Antisocial features which do constitute a danger to the health or safety of others in the community at the present time."

Plaintiff first argues that the Board's application of ORS 144.125(3) (1993) violated the *ex post facto* provisions of

the state and federal constitutions. In *Meadows v. Schiedler*, 143 Or App 213, 924 P2d 314 (1996), we determined that the Board's application of ORS 144.125(3) (1993) to defer the release on parole of prisoners whose crimes were committed before the effective date of that statute violated the *ex post facto* provisions of the state and federal constitutions. Plaintiff's crimes were committed before the effective date of the Act and, accordingly, plaintiff is correct that the Board erred in applying the 1993 statute. However, that conclusion is not dispositive here because, as noted above, the Board also made alternative findings under the earlier version of the statute and concluded that plaintiff's release should be deferred under that statutory standard.

We therefore turn to the question of whether the Board's conclusion that plaintiff suffers from a "present severe emotional disturbance that constitutes a danger to the health or safety of the community" satisfied the requirements of ORS 144.125(3) (1991). Plaintiff's sole argument on this point is that the psychiatric or psychological diagnosis *itself* must include the determination that the prisoner suffers from a "present severe emotional disturbance such as to constitute a danger to the health or safety of the community." Plaintiff asserts that Davis' diagnosis does not satisfy that criterion because it does not include such a conclusion.

Defendant responds that, although ORS 144.125(3) (1991) does appear to require the existence of a psychiatric or psychological diagnosis, the statute does not require the diagnosis itself to include a specific determination that the prisoner suffers from a "present severe emotional disturbance such as to constitute a danger to the health and safety of the community." It is defendant's position that this statutory standard is a legal one, rather than a medical one, and that it is for the Board, not the psychiatrist or psychologist, to apply this legal standard. Defendant further argues that the Board is entitled to review all of the evidence before it, not just the psychiatric or psychological diagnosis, in deciding whether a prisoner suffers from a "present severe emotional disturbance such as to constitute a danger to the health or safety of the community." ORS 144.125(3) (1991). For the reasons that follow, we agree with defendant.

■ We conclude that the text of ORS 144.125(3) (1991), particularly when read in the context of other related statutes, does not require that a psychiatrist or psychologist recite the words "severe emotional disturbance" when diagnosing the prisoner, nor does it require that the Board base its release decision solely on a psychiatrist's or psychologist's diagnosis of "severe emotional disturbance." As defendant asserts, the terms "severe emotional disturbance" are not readily definable medical terms. The standard and commonly recognized psychiatric and psychological diagnoses are set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM), of which the fourth edition, DSM-IV, is the current edition. That volume contains no reference to a psychological diagnosis of "severe emotional disturbance."[1] We do not believe that the legislature's choice of the phrase "severe emotional disturbance" reflects an intention that a psychiatrist or psychologist, rather than the Board, make the final determination whether a prisoner's release should be deferred.[2] *See, e.g., State v. Huntley,* 302 Or 418, 730 P2d 1234 (1986) (in determining whether defendant satisfied the "dangerous offender" legal criterion of "suffering from a severe personality disorder indicating a propensity toward criminal activity," the court was "not bound by the conclusions of a psychotherapist"); *State v. Trice,* 146 Or App 15, 933 P2d 345, *rev den* 325 Or 280 (1997) (same); *State v. Odoms,* 117 Or App 1, 844 P2d 217 (1992), *rev den* 316 Or 529 (1993) (same).

■ Defendant further asserts that the statute contemplates that the Board consider all information properly

---

[1] That volume does, however, provide the diagnostic criteria for the personality disorders with which Davis diagnosed plaintiff. *See* DSM-IV 629-56 (4th ed 1994).

[2] We recognize that Davis's psychological evaluation in the present case did, in fact, describe plaintiff as suffering from an "emotional disturbance" which consisted of the DSM-IV personality disorder diagnoses described above, and that Davis further opined that the disorder in question did render plaintiff a present danger to the health and safety of others in the community. However, given our conclusion that the statutory language reflects a legal standard rather than a medical diagnosis, the presence or absence of such language in a psychological evaluation is not dispositive of whether a Board's finding of "present severe emotional disturbance such as to constitute a danger to the health or safety of the community" under ORS 144.125(3) (1991) is adequate.

before it, and not just the psychiatric or psychological diagnosis, in reaching a conclusion about whether a prisoner suffers from a "present severe emotional disturbance such as to constitute a danger to the health or safety of the community" under ORS 144.125(3) (1991). We agree. ORS 144.185 specifically authorizes the Board, before "making a determination regarding a prisoner's release on parole as provided by ORS 144.125," to acquire information other than a psychiatric or psychological diagnosis, including:

> "(1) Any relevant information which may be submitted by the prisoner, the prisoner's attorney, the victim of the crime, the Department of Correction, or by other persons;

> "(2) The presentence investigation report specified in ORS 144.791 or if no such report has been prepared, a report of similar content prepared by institutional staff;

> "(3) The reports of any physical, mental and psychiatric examinations of the prisoner;

> "(4) The prisoner's parole plan; and

> "(5) Other relevant information concerning the prisoner as may be reasonably available."

It would make little sense for the legislature to provide the Board access to information for use in a parole release hearing under ORS 144.125 from the victim of the crime, from the presentence investigation report, as well as "[o]ther relevant information," if such information was not, in fact, relevant to the Board's determination of whether the prisoner's emotional disorder was (a) present, (b) severe, and (c) one that made the prisoner a "danger to the health and safety of the community." A "diagnosis" of a mental disorder, standing alone, will not always provide the necessary information for the Board to make such a determination. Diagnosis is "the art or act of identifying a disease from its signs and symptoms." *Webster's Third New Int'l Dictionary*, 622 (unabridged ed 1993). The DSM-IV explains the limited use that should be made of psychiatric and psychological diagnoses in determining questions of law:

> "When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are

significant risks that diagnostic information will be misused or misunderstood. Those dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. *In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a 'mental disorder,' 'mental disability,' 'mental disease,' or 'mental defect.'* In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), *additional information is usually required beyond that contained in the DSM-IV diagnosis.* This might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that *assignment of a particular diagnosis does not imply a specific level of impairment* or disability.

"[T]he fact that an individual's presentation meets the criteria for *a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder.* Even when diminished control over one's behavior is a feature of a disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time.

"* * * * *

"The use of DSM-IV in forensic settings should be informed by an awareness of the risks and limitations discussed above. When used appropriately, diagnoses and diagnostic information can *assist* decision makers in their determinations." DSM-IV at xxiii-xxiv. (Emphasis supplied.)

It is apparent from the text and context of ORS 144.125 (1991) that the determination as to whether a prisoner suffers from a severe emotional disturbance such as to constitute a danger to the health and safety of the community is a judgment that the legislature intended the Board to make. Although a psychiatric or psychological diagnosis is a prerequisite to the Board's consideration of whether the statutory criteria have been met, that diagnosis alone does not dictate the result. ORS 144.125(3) (1991) allows the Board to

consider both a psychiatric or psychological diagnosis and other pertinent evidence in the record in exercising its judgment as to whether the prisoner's release should be deferred. We conclude that the Board properly exercised its authority in deferring plaintiff's release date and that the trial court did not err in dismissing the writ of *habeas corpus*.

Neither plaintiff's nor defendant's other arguments merit discussion.

Affirmed.

**WARREN, J.,** dissenting.

The majority reaches a result that may reflect its sense of good policy but that does not reflect what the legislature did. Because I believe that we should require the Parole Board to follow the statute rather than its (or our) current ideas of what is the best policy, I dissent.

The issues in this case can best be understood in the context of the parole system that was in effect at the time of plaintiff's offense and that applies to him. Under that system, which was the predecessor of the current sentencing guidelines, the Board's parole matrix is the primary determinant of a prisoner's actual period of incarceration. The trial court's sentence simply sets the maximum term that the prisoner can serve. The heart of the matrix system is ORS 144.120(1), which required the Board to establish plaintiff's initial parole release date shortly after he began serving his sentence. In setting the date, the Board was to follow the parole matrix that it had previously adopted and was also to consider other things that the statute rendered relevant, including the presentence report, ORS 144.120(3), and information from the victim and the district attorney. ORS 144.120(5). The parole release date has a crucial legal significance for a prisoner under the matrix system: "When the State Board of Parole and Post-Prison Supervision has set a date on which a prisoner is to be released upon parole, *the prisoner shall be released on that date,*" unless the prisoner remains subject to an unexpired minimum term, an exception that does not apply to plaintiff. ORS 144.245(1) (emphasis supplied).

Plaintiff had a statutory entitlement to be released on the initial release date in the absence of valid Board action extending that date.

The only authority that the Board cited when it extended plaintiff's parole release date is ORS 144.125(3). The validity of plaintiff's continued imprisonment, thus, turns on whether the Board properly exercised its authority under that statute. The majority correctly holds that the 1991 version of ORS 144.125(3), rather than the 1993 version, controls. *Meadows v. Schiedler*, 143 Or App 213, 924 P2d 314 (1996). That version provides:

> "If *a psychiatric or psychological diagnosis* of present severe emotional disturbance such as to constitute a danger to the health or safety of the community *has been made with respect to the prisoner*, the board may order the postponement of the scheduled parole release until a specified future date." (Emphasis supplied.)

It is hard to see how this statute could be more clear. In order to extend a parole release date under it, there *must* be a psychiatric or psychological diagnosis with respect to the prisoner, and that diagnosis *must* be of a "present severe emotional disturbance such as to constitute a danger to the health or safety of the community." The statute does *not* say that the Board, after considering the diagnosis and other information in its possession, may extend the parole release date if *the Board* comes to that conclusion; rather, it says that there must be a psychiatric or psychological diagnosis to that effect. The diagnosis is an absolute prerequisite to Board action.

The majority does not like that express statutory requirement, but each of the reasons that it gives for ignoring the plain language of the statute is unconvincing. First, it states that the psychiatric and psychological professions do not make diagnoses in the precise terms that the statute provides and prefer that agencies not use diagnoses in the way that the statute requires. That does not change the fact that the legislature has required that the diagnosis satisfy the conditions that it stated before the diagnosis can be the basis for extending a parole release date. The Board must follow the law that the legislature created, even if that law does not

fit perfectly into some profession's categories. The statute does not mean that the diagnosis must use the precise statutory terms. The Board may examine the expert's report in order to determine whether it contains a diagnosis that meets the legal standard that the legislature adopted. That does not affect the fact that the statute unequivocally permits the Board to examine *only* the expert's report for that purpose.

Second, the majority relies on ORS 144.185, which lists a number of factors that the Board should take into account before making a determination regarding a prisoner's release on parole under ORS 144.125, to suggest that ORS 144.125(3) does not mean what it says. There are at least two obvious answers to the majority's position, each of which is sufficient in itself to refute it. The first is that under ORS 144.125(3) a finding of the appropriate diagnosis does not require the Board to extend the parole release date; rather, it simply allows the Board to exercise its discretion. The material described in ORS 144.185 would assist the Board in that task. The second answer is that ORS 144.125(1) requires an adequate parole plan before the prisoner's actual release; under ORS 144.125(4), the Board may postpone the parole release date by no more than three months if the parole plan is inadequate. All of the information in ORS 144.185 is relevant to determining whether the parole plan is adequate, and that statute can be entirely explained by the need to evaluate the parole plan. There is no reason to use that statute to distort the meaning of ORS 144.125(3).

In its order in this case, which follows the form that it has used in many other cases, the Board did not find that there was a psychiatric or psychological diagnosis that met the statutory standard.[1] Rather, it stated that "THE DOCTOR'S DIAGNOSIS *COUPLED WITH ALL THE INFORMATION [THE BOARD] IS CONSIDERING,* DOES RESULT IN A FINDING OF A SEVERE EMOTIONAL DISTURBANCE THAT CONSTITUTES A DANGER TO THE

---

[1] I do not need to consider whether the Board could have concluded that the report that the majority quotes does meet that standard; it is the Board's responsibility to evaluate that report, at least in the first instance.

HEALTH OR SAFETY OF THE COMMUNITY." (Emphasis supplied.) Because the Board expressly relied on information beyond the expert's report, its order does not satisfy the requirements of ORS 144.125(3), and plaintiff is entitled to relief.

One purpose of the matrix system, which continues in effect for defendant and a number of other prisoners, was to bring uniformity and certainty to the actual effect of judicial sentencing decisions. It did so by relying on uniform and certain parole decisions, which became the primary determinant of the length of incarceration. To achieve that result, the matrix system restricted the Board's discretion in setting and changing the dates for releasing prisoners. The strict requirements for extending the parole release date that ORS 144.125(3) contains are an essential part of the system and, thus, of the overall legislative purpose. By its decision in this case, the majority has overturned an important part of the matrix system and has thus thrown the entire system out of balance. Because I cannot join in undoing the legislature's action, I respectfully dissent.

Edmonds, Armstrong and Wollheim, JJ., join in this dissent.